IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **JONI M. CLASON,** | Case 3:15 CV 1171 |
| Plaintiff, | Judge David A. Katz |
| v. | Magistrate Judge James R. Knepp, II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | REPORT AND RECOMENDATION |

## INTRODUCTION

Plaintiff Joni Clason ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated June 11, 2015). For the reasons stated below, the undersigned recommends affirming the Commissioner's decision to deny benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in January 2011, alleging an onset date of December 3, 2010.[1] (Tr. 207). Her claims were denied initially and upon reconsideration. (Tr. 129-35, 144-52). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 157). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the

---

1. Plaintiff had previously filed for DIB and SSI benefits on June 30, 2008; her applications were denied by an ALJ on June 15, 2010. (Tr. 11). The ALJ found severe impairments and restricted Plaintiff to a limited degree of light work. Pursuant to *Drummond v. Comm'r of Soc. Sec.,* 126 F.3d 837 (6th Cir. 1997), the ALJ in this case is bound by the previous findings of an ALJ unless new and material evidence warrants a changed finding.

ALJ on December 30, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 8-26, 32-55). The Appeals Council denied Plaintiff's request for review making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on June 11, 2015. (Doc. 1).

FACTUAL BACKGROUND

*Personal Background and Testimony*

Plaintiff was born on November 28, 1976; she was 37 years old at the ALJ hearing. (Tr. 36). She lived with her thirteen year old daughter and had her GED. (Tr. 36-37). Plaintiff testified that she had a driver's license but she had trouble driving at night because of her vision and did not like traffic because she got anxiety. (Tr. 36-37). She also testified she is legally blind in her right eye and had been her whole life. (Tr. 42). Plaintiff estimated she could stand for only about fifteen to twenty minutes before needing to sit down, walk for one city block, sit for an hour, and lift between five and fifteen pounds. (Tr. 38-39). Plaintiff reported sleeping three hours in a typical night and did not nap during the daytime; she was prescribed medication for her inability to sleep. (Tr. 40-42).

At the time of the hearing, she had been working at a pizza parlor for almost a year and worked fifteen hours a week. (Tr. 37). She testified she could not work full-time because she could not stand for long periods and because she had anxiety around others. (Tr. 38). Plaintiff reported she was fired from another pizza place because she was not dealing with customers appropriately and stated that at her current job she does not have contact with customers. (Tr. 43). Her duties at her job are stocking, rolling the dough on a machine, topping the pizza, and occasionally removing the pizza from the oven. (Tr. 44-45). She testified she had problems with

2

her hands due to carpal tunnel syndrome which caused her hands to hurt and go numb. (Tr. 40). However, she stated she used her hands continuously in her work as a pizza maker. (Tr. 40).

Plaintiff testified that at the time of the hearing, she was not on any medication for her mental problems. (Tr. 47). She had tried one type of medication and thought it was unhelpful, so she refused to try any others. (Tr. 47-48). She also did not attend mental health counseling because she did not think it was helpful. (Tr. 48).

In disability reports, Plaintiff stated she did not clean or drive and her mother did her laundry. (Tr. 294, 314). She reported her constant need to be off her feet—to avoid the pain—prevented her from taking care of her personal hygiene. (Tr. 313). She complained of leg, back, and neck pain which caused headaches and she claimed she had increased aggression and a quick temper. (Tr. 304).  Plaintiff connected the headaches to her poor concentration and memory. (Tr. 309, 314). She also reported the constant pain and stress from her increasing physical problems was having an effect on her mental health, particularly her depression. (Tr. 320).

Plaintiff stated she could dress, shower, work, and perform light cooking but her mother and son had to care for her pets and do the shopping. (Tr. 321, 323). She reported periods of not being able to sleep followed by wanting to sleep all the time. (Tr. 321). Plaintiff did not pay bills or handle money and left it to her mother because it was stressful and confusing. (Tr. 323). She stated she did take her kids out to play and played board games with them. (Tr. 324).

***Relevant Medical Evidence*[2]**

*Mental*

On August 17, 2010, Plaintiff was seen at Maumee Valley Guidance Center by Michelle Kistner, PCC, for outpatient psychological counseling. (Tr. 375). She reported that she was only seeking treatment because her family was forcing her and she did not want medications. (Tr. 375). Plaintiff complained of depression, decent sleeping when medicated, increased appetite, anhedonia, worthlessness, low energy, and poor concentration. (Tr. 376). Her mental status evaluation revealed good hygiene, adequate grooming, cooperative behavior, appropriate speech, logical thought process, depressed mood, constricted affect, poor judgment and insight, sustained attention/concentration, and normal memory. (Tr. 376-77). Ms. Kistner diagnosed Plaintiff with major depressive disorder (recurrent) and assigned a Global Assessment of Functioning ("GAF") score between 51-55.[3]

Plaintiff returned in December 2010 and "wore a long sad look on her face" throughout the session but appeared less anxious. (Tr. 373). Ms. Kistner remarked that Plaintiff had made no progress in her struggle with anxiety and depression. (Tr. 373). In April 2011, Plaintiff "seemed fidgety" and had a "jitteriness to her voice". (Tr. 429). Ms. Kistner reported Plaintiff complained of anxiety, panic, and irritability; she confirmed the major depression diagnosis and further diagnosed panic disorder with agoraphobia. (Tr. 429). On September 2, 2011, Ms. Kistner

---

2. Plaintiff included medical records from Westwood Behavioral Health Center that were considered by the prior ALJ in her opinion of June 15, 2010 (*See* Tr. 116-17); as such, that information will not be summarized herein because it is neither new nor material evidence. *See Drummond,* 126 F.3d 837.

3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

related that Plaintiff was having auditory hallucinations which were urging her to hurt herself and also, that she had paranoid thinking. (Tr. 431).

*Physical*

In November 2010, Plaintiff sought pain management for her leg and back pain which she described as "constant, aching, burning, pressure, sharp pain." (Tr. 415). On physical examination, she had normal gait; could not perform toe walking; performed heel walking with difficulty; reduced range of motion in the lumbar spine; full motor function bilaterally in her lower extremities; normal reflexes; and negative straight leg raise tests. (Tr. 416). The doctor ordered MRIs of her thoracic and lumbar spine. (Tr. 416).

On January 4, 2011, Plaintiff had a MRI of her brain which revealed a couple of "tiny, non-specific white matter signal abnormalities" but "no focal mass or significant signal abnormality." (Tr. 398). On the same day, she also had a MRI of her cervical spine which was normal aside from a small cyst in her sinus. (Tr. 399). Plaintiff returned on January 6, 2011, for a second MRI of her brain. (Tr. 400). The results of the second MRI revealed no further abnormalities. (Tr. 400). Daniel Gaudin, M.D., opined neither the cyst nor the brain lesions were significant. (Tr. 414).

In January 2012, Dr. Duane Johnson reported that Plaintiff had diabetic neuropathy that responded somewhat to Neurontin. (Tr. 438). On July 16, 2012, Plaintiff had another MRI of her brain which revealed the two previous lesions were stable in size but a third lesion had appeared; but again, the findings were unremarkable. (Tr. 455). In August 2012, a MRI of the thoracic spine was taken; it revealed no abnormalities. (Tr. 459). On January 3, 2013, a MRI of her cervical spine was normal. (Tr. 460). A March 14, 2013, x-ray of Plaintiff's right hip was negative for abnormalities. (Tr. 461). An x-ray of her sacroiliac joint in her left hip revealed mild

degenerative changes in April 2013. (Tr. 462). A month later, a MRI of her pelvis was terminated early due to Plaintiff's complaints of pain but possibly revealed mild tendinopathy in the left hip. (Tr. 463). An ultrasound of the pelvis showed a mass in her right ovary suggestive of an ovarian cyst or dermoid tumor. (Tr. 464). In June 2013, Plaintiff received corticosteroid and anesthetic injections into her left sacroiliac joint. (Tr. 482).

***Opinion Evidence***

In February 2012, Dr. Johnson allegedly completed a physical RFC on behalf of Plaintiff.[4] Dr. Johnson, who treated her for two years, noted her diagnoses as social anxiety, manic depression, Type II diabetes, asthma, hypertension, GERD, diabetic neuropathy, and carpal tunnel syndrome. (Tr. 439). He reported Plaintiff's symptoms as bilateral leg, shoulder, and neck pain, daily headaches, and right hand pain and weakness due to carpal tunnel. (Tr. 439). In support of this pain, Dr. Johnson noted slightly decreased strength in the bilateral upper extremities and right lower extremity, decreased strength in the left lower extremity, and straight leg raise test. (Tr. 439). He also reported depression and anxiety had a negative effect on Plaintiff's physical conditions. (Tr. 440).

Dr. Johnson opined Plaintiff was capable of "low stress" jobs; could walk one city block; sit/stand for one hour without a break; could stand/walk for less than two hours in an eight-hour day; could sit for two hours in an eight-hour workday; needed a sit/stand option at work; needed unscheduled breaks once every hour for ten minutes; did not need a cane; could frequently lift/carry less than ten pounds, occasionally lift/carry twenty pounds, and rarely lift/carry fifty

---

4. The physical RFC form submitted to the ALJ for review at the December 30, 2013, hearing did not include the final page of the evaluation which included Dr. Johnson's signature. (*See* Tr. 439-42). In his opinion, the ALJ remarked that this opinion was "neither dated nor signed." (Tr. 21). Plaintiff submitted a complete copy of the RFC to the Appeals Council. (Doc. 13, at 11). A complete copy of the physical RFC can be found in the record before this Court. (*See* Tr. 505-11). The Court will undertake a discussion into the relevance of this fact below.

pounds; could frequently twist and stoop but only rarely squat or crouch; could rarely climb ladders but occasionally climb stairs; and could only perform gross and fine manipulation with her hands 50% of the day. (Tr. 440-42).

*State Agency Reviewers*

On February 15, 2011, Paul Tangeman, Ph.D., opined Plaintiff had mild restrictions in activities of daily living, maintaining social functioning, and in concentration, persistence, and pace. (Tr. 63). He affirmed the prior ALJ determination that Plaintiff's dysthymic disorder, panic disorder, and personality disorders were non-severe impairments. (Tr. 64). On April 12, 2011, Gary Hinzman, M.D., affirmed the physical RFC finding of the prior ALJ. (Tr. 65). The ALJ found that Plaintiff could perform light work except she could only lift/carry twenty pounds occasionally; frequently lift/carry ten pounds; stand/walk/sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and frequently finger. (Tr. 119).

On reconsideration in November 2011, Kristen Haskins, Psy.D., opined no restrictions in activities of daily living; moderate restrictions in social functioning; and mild difficulties in maintaining concentration, persistence, and pace. (Tr. 88). This deviation from the prior ALJ decision was due to new evidence that Plaintiff's psychological symptoms had worsened, "specifically, her ability to relate to the general public." (Tr. 88). William Bolz, M.D., affirmed the physical RFC from the prior ALJ hearing. (Tr. 90).

*Consultative Examinations*

On October 25, 2011, Plaintiff underwent a psychological consultative examination with Christopher Ward, Psy.D. (Tr. 432). Plaintiff reported having no friends but having regular contact with her children. (Tr. 434). She stated she worked part time, slept a lot, watched TV, performed light chores, could bath independently, and could shop. (Tr. 434). On mental status

7

evaluation, Dr. Ward noted inappropriate outfit; adequate hygiene; cooperative behavior; normal speech; low/average intellectual functioning; depressed and withdrawn mood; flat affect; no indications of anxiety; adequate remote recall; below average short-term memory; completed serial 7s; adequate attention and concentration; and adequate judgment. (Tr. 434-35).

Dr. Ward diagnosed mood disorder, polysubstance dependence in remission, and assigned a GAF score of 62.[5] (Tr. 435-36). He opined Plaintiff had adequate abstract reasoning skills and could converse effectively but her below average short term memory skills could lead to difficulty remembering instructions. (Tr. 436). He also concluded although Plaintiff described difficulties maintaining concentration; he had made no observations consistent with a limitation in that area. (Tr. 436). In dealing with coworkers, Dr. Ward believed her average intelligence would present no problems in communicating with others but her depression could affect her engagement with others. (Tr. 436-37). Finally, Dr. Ward opined that her emotional instability could prevent her from responding appropriately to work pressures and could negatively affect her overall mental state. (Tr. 437).

On November 11, 2013, Plaintiff underwent a second psychological consultative examination with Neil Shamberg, Ph.D. (Tr. 466). Plaintiff reported her activities of daily living were working fifteen to eighteen hours per week, driving, no cooking or chores, watching TV, sleeping a lot, and no socializing outside of her family. (Tr. 471-72). On mental status evaluation, Dr. Shamberg observed she appeared "on the verge of tears, she appeared to be very, very depressed"; avoided eye contact; cooperative behavior; problems with short-term and long-term memory; logical, coherent, and goal-directed thought content; no visible signs of anxiety;

---

5. A GAF score between 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.*

low average intelligence; low motivation; and moderately impaired judgment. (Tr. 472-73). Dr. Shamberg diagnosed major depressive disorder (recurrent, currently very severe, with some psychotic features), social phobia, anxiety disorder, and borderline personality disorder. (Tr. 473). He also assigned her a GAF score of 42.[6]

Dr. Shamberg opined Plaintiff had moderate restrictions in her ability to understand, remember, and carry out simple instructions and make simple workplace decisions but had a marked restriction in her ability understand, remember, and carry out complex instructions and make complex workplace decisions. (Tr. 466, 474). He attributed these restrictions to her <u>untreated</u> major depression, social phobia, and other anxiety disorders. (Tr. 466) (emphasis in original). He found Plaintiff had marked and extreme limitations in her ability to interact with people due to her social phobia. (Tr. 467, 474). He also opined work pressures would cause Plaintiff significant problems because of her depression and severe social phobias. (Tr. 475). Dr. Shamberg believed Plaintiff could manage her own benefits. (Tr. 468, 474).

On November 23, 2013, Plaintiff attended a consultative physical examination with Christina Feser, D.O. (Tr. 487). Dr. Feser observed "symmetric, steady but slow gait"; good hand-eye coordination; negative straight leg raise test bilaterally; tenderness in the thoracic and lumbar spine, and bilaterally in her hips and knees. (Tr. 491-92). Plaintiff was unable to squat but could get on and off the exam table without assistance. (Tr. 492). She also observed full strength; no deficiency to grasp manipulation, pinch, or fine coordination; no muscle spasm, atrophy, or clonus; and diminished range of motion in the dorsolumbar spine and bilateral hips. (Tr. 492). Dr. Feser believed that Plaintiff did not give a good effort during the examination. (Tr. 492).

---

6. A GAF score between 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

Dr. Feser opined Plaintiff could sit for an eight-hour day with normal breaks but had mild limitations in standing and walking due to her back pain and neuropathy. (Tr. 493). Dr. Feser did not believe Plaintiff needed an assistive device. (Tr. 493). She also concluded Plaintiff had mild limitations in lifting and carrying, and could only occasionally bend, stoop, crouch, or squat. (Tr. 493). Further, Dr. Feser found no manipulative limitations in reaching, handling, feeling, grasping, or fingering; and concluded she could perform these tasks frequently. (Tr. 493).

***VE Testimony and ALJ Decision***

In the first hypothetical, the ALJ described an individual who could do light work but could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; occasionally use their bilateral lower extremities for foot controls; frequently use her bilateral upper extremities for reaching, handling, and fingering; could not do jobs requiring bilateral vision; and she should avoid exposure to hazards, unprotected heights, irritants, extreme cold and heat, and vibrations. (Tr. 50). Mentally, she was restricted to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only work-related decisions with few, if any workplace changes; with no interaction with the general public, and only occasional interaction coworkers and supervisors. (Tr. 50).

Based on this hypothetical, the VE ruled out all of Plaintiff's past work but opined she could perform work as a housekeeper, mail clerk, and a packager. (Tr. 51). The second hypothetical maintained the same restrictions except that the individual could only perform sedentary work. (Tr. 51). The VE opined an individual with those restrictions could be a document preparer, copy examiner, or unskilled inspector. (Tr. 52). Plaintiff's attorney added an additional restriction of a sit/stand option on the second hypothetical; and the VE confirmed

10

Plaintiff could still perform the stated jobs. (Tr. 54). Plaintiff's attorney further restricted the second hypothetical to occasional reaching, handling, and fingering. (Tr. 54). The VE testified that no work would be available. (Tr. 54).

In the third hypothetical, the ALJ described an individual who could perform sedentary work, with an at-will sit/stand option, the individual could only stand/walk/sit for two hours in an eight hour day, and would consistently be allowed to take five extra ten minute breaks per shift. The VE testified there would be no work for such an individual. (Tr. 53).

In January 2014, the ALJ concluded Plaintiff had the severe impairments of diabetes mellitus with sensorineural peripheral neuropathy, bilateral carpal tunnel syndrome, obesity, osteoarthritis, spinal cord lesion,[7] blind in right eye, major depressive disorder recurrent with psychotic features, and panic disorder with agoraphobia; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 14-17). The ALJ outlined an RFC for light work except that she could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; occasionally use their bilateral lower extremities for foot controls; frequently use their bilateral upper extremities for reaching, handling, and fingering; could not do jobs requiring bilateral vision; and she should avoid exposure to hazards, unprotected heights, irritants, extreme cold and heat, and vibrations. (Tr. 17). Mentally, she was restricted to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements involving only work-related decisions with few, if any workplace changes; with no interaction with the general public, and only occasional interaction coworkers and supervisors. (Tr. 17).

---

7. The preceding impairments were all found to be severe in the previous ALJ hearing and the current ALJ confirmed that they remain severe impairments. (Tr. 14-15).

Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could perform positions such as housekeeper, mail clerk, and packager. (Tr. 24).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Commissioner considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) he failed to adequately explain the weight he gave to the opinions rendered by Drs. Johnson and Shamberg; (2) his credibility/pain determination was contrary to law; and (3) the Step Five hypotheticals did not accurately describe Plaintiff. (Doc. 13). The Court will address each argument in turn.

Preliminarily, upon review of Plaintiff's brief the Court has found that it contains very little citation to evidence of record and bare bones arguments that are supported only by regurgitation of legal standards but no application to the facts of the case. (*See* Doc. 13). "It is

13

not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to…put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Where Plaintiff has not put any serious effort to develop a particular argument, the court can decline to "formulate arguments on [a claimant's] behalf, or to undertake an open-ended review of the entirety of the administrative record…" *Hollon ex rel. Hollan v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006); *see also Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) ("It is well established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). In this case, Plaintiff's brief is almost unsuitable for review. Thus, although the Court declines to dismiss the appeal outright; the Plaintiff's lack of developed argument in support of her contentions, particularly the lack of citation to inconsistent record evidence, left the Court to divine the basis of the arguments from the entirety of the record. A wholly improper exercise.

### *Weight of Medical Opinions*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion.

14

*Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Johnson*

Plaintiff argues the ALJ should have adopted Dr. Johnson's opinion but when he failed to do so, he did not provide good reasons. (Doc. 13, at 9-10). She also argues that the ALJ had a duty to bring to her attention that Dr. Johnson's opinion was incomplete, i.e., that it was missing the signature page. (Doc. 13, at 10-11). The Court will first address whether the ALJ had a duty to inform the Plaintiff that the records submitted were incomplete.

Plaintiff asserts the ALJ's failure to obtain the last page of the physical RFC from Dr. Johnson was reversible error because he had a duty to develop the record. (Doc. 16, at 3-4). As support for this argument, Plaintiff cited a regulation out of context, provided a quote from a regulation with an incorrect citation, and mischaracterized the holding of an unpublished Sixth Circuit decision, *Strang v. Comm'r of Soc. Sec*., 611 F.App'x 271 (6th Cir. 2015). In *Strang, the*

15

Plaintiff was unrepresented and the ALJ made multiple affirmative statements that she would procure records which she ultimately failed to do. *Id.* These are completely different circumstances from the case at hand; Plaintiff was represented at the hearing (by her current attorney), her attorney confirmed to the ALJ that the record was complete at the time of the hearing, and the ALJ made no promises to obtain further records. (Tr. 35). The Sixth Circuit has stated "[o]nly under special circumstances, i.e., when claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record." *Duncan v. Sec'y of Health and Human Servs.,* 801 F.2d 847, 856 (6th Cir. 1986). These special circumstances do not apply here. Plaintiff's failure to provide complete information to the ALJ is not reason for reversal and she cannot avoid responsibility for her own failure. Ultimately, it is her burden to prove entitlement to disability and provide the medical documentation to support her claims. 20 C.F.R. § 404.1512(a-c).

Furthermore, this Court cannot review the complete physical RFC, even though Plaintiff submitted it in the record, because it was not before the ALJ at the time he made his decision. *See Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for [disability] on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."). Indeed, this "court is confined to review evidence that was available to the Secretary, and to determine whether this decision of the Secretary is supported by substantial evidence." *Cotton v. Sullivan*, F.3d 692, 695–96 (6th Cir. 1993). Thus, the Court will review the ALJ's reasoning as to Dr. Johnson's opinion as it was presented to him in the original record, unsigned and undated.

16

Plaintiff challenges the good reasons provided by the ALJ; but as asserted above, she provides no argument beyond a recitation of the law and conclusory sentences that the failure to accept Dr. Johnson's opinion was prejudicial. (Doc. 13, at 9-11). Plaintiff does not even allege why the reasons given were incorrect, let alone provide citation to contrary evidence; thus, it is difficult for the Court to review her argument. The ALJ discounted the opinion of Dr. Johnson because it was "neither dated nor signed", it opined on an area for which he did not treat her (mental impairments), and the standing/walking limitation was inconsistent with her work activity. (Tr. 21).

All of these reasons contemplate the required factors: first, an undated and unsigned opinion necessarily questions who completed the form, their qualifications, and the length of their relationship. Second, Dr. Johnson never treated Plaintiff for her mental impairments nor did he prescribe her medication for her mental health symptoms, as confirmed by Plaintiff's testimony. (Tr. 46-47). Thus, his opinion regarding her mental impairments and their effect on her abilities is not his specialty. *See* § 1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Lastly, the ALJ found Dr. Johnson's standing/walking limitation to be inconsistent with Plaintiff's current work history where for almost a year she had been working five hours a day, three days a week, at a pizza parlor where she stood the whole time. (Tr. 284). In sum, the Court finds that the ALJ proffered good reasons for the weight assigned to Dr. Johnson's opinion and did not commit error.

*Dr. Shamberg*

First, Dr. Shamberg is not a treating physician because he does not have an ongoing treatment relationship with the Plaintiff. 20 C.F.R. § 404.1502. Thus, there is no presumption of

17

controlling weight for the opinion; however, the ALJ must assign weight to the opinion. §§ 404.1527(c); 404.1527(e)(2)(ii). In doing so, the ALJ must provide a meaningful explanation for the weight assigned to the non-treating source and this is accomplished by weighing the same factors as applied to a treating physician. *See* § 404.1527(c) (requiring some explanation for the weight afforded non-treating sources); *Rabbers*, 582 F.3d at 660 (factors include length of relationship, frequency of examination, supportability, consistency, and specialization of source).

The ALJ accorded little weight to the opinion of Dr. Shamberg because it "provides only a snapshot of [Plaintiff's] condition in time", the opinion was completed when Plaintiff was not seeking mental health treatment, and it was inconsistent with her current work activity. (Tr. 23). Plaintiff makes almost no reference to Dr. Shamberg's opinion in her brief nor does she provide an argument for why the reasons given by the ALJ were inaccurate. (*See* Docs. 13, 16).  Instead, she simply argues that the ALJ should have credited Dr. Shamberg's limitations.. (*See* Docs. 13, 16).  Ultimately, Plaintiff's failure is irrelevant because upon review of the ALJ's opinion it is apparent he considered the necessary factors in weighing the opinion.

Here, the ALJ assigned weight to Dr. Shamberg's opinion and explained that he did not afford it much weight because it was based on a one-time encounter when Plaintiff had left her mental impairments untreated for over two years and further, because it was inconsistent with her actual work activity. (Tr. 23). This explanation clearly touches on the required factors for consideration – particularly, consistency, length of treatment relationship, and noncompliance with treatment. *See* § 404.1527(c) (in weighing a non-treating source opinion an ALJ may consider any fact "which tend[s] to support or contradict the opinion"); § 404.1530(b) (noncompliance with recommended treatment without good reason does not support a finding of disability). Citation to these factors is accurate and relevant to the weight of Dr. Shamberg's

18

opinion; Dr. Shamberg only saw Plaintiff once, he noted her depression was untreated and that she refused to take medication, and his limitations with regard to Plaintiff's work ability did not comport with her consistent part-time work history (including her current work activity). (*See* Tr. 469-74). The ALJ satisfied his requirement to analyze and assign weight to the non-treating source's opinion; and thus, he did not err.

***Credibility***

Where, as here, the medical evidence does not show abnormalities, the question of disability can turn on a credibility determination. An ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). An ALJ is not required to accept as credible a Plaintiff's testimony regarding symptoms, *see Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004), and in evaluating that credibility the ALJ can consider the entire record SSR 96-7p, 1996 WL 374186, *1. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

19

The ALJ determined Plaintiff's severe and non-severe impairments combined with Plaintiff's subjective complaints, could reasonably be expected to cause some of the alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (Tr. 20-21). In reaching this conclusion, the ALJ summarized Plaintiff's complaints of pain but then noted the lack of objective medical evidence, her work history, her embellishment of illnesses, and her internally inconsistent statements. (Tr. 18-21).

In his decision, the ALJ noted Plaintiff's main allegation regarding her disability was her inability to stand; yet, the objective evidence in the record provides little support for her claims. The ALJ cited to diagnostic testing that revealed only mild degenerative changes in the left sacroiliac joint and possible, but unconfirmed, mild tendinopathy. (Tr. 21, 462-63). This is compared against MRIs of her back and right hip which were normal (Tr. 399, 459-61) and physical examinations that revealed normal gait, full lower extremity function, and negative straight leg raise tests (Tr. 416, 491-92). In fact, the medical record is almost completely devoid of records from treating professionals who observed or treated Plaintiff's complaints of pain. The only evidence of treatment is medication for neuropathy, which was somewhat helpful, and a corticosteroid injection into her left hip, of which there is no evidence of follow-up. (Tr. 438, 482). The ALJ also noted Plaintiff's work activity – standing/walking at work for five hours a day, three days a week – undermined her allegations of an inability to stand/walk. (Tr. 21, 284).

As to Plaintiff's general credibility, the ALJ remarked that she consistently reported having brain tumors but the objective findings did not support these claims. (Tr. 20-21, 289-90, 300, 320, 414, 433). And she testified that she did not sleep more than three hours a night despite reports to multiple examiners that she slept a lot. (Tr. 21, 40-42, 434, 471-72). While these last

20

two citations are not specifically relevant to an analysis of pain; internal inconsistencies within Plaintiff's statements and an embellishment of a non-significant brain lesion undermine the veracity of her other complaints. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 532 (6th Cir. 1997) ("discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").

In total, the ALJ cited to relevant factors such as Plaintiff's work activities, lack of objective medical evidence to support her allegations, lack of treatment for her alleged pain, the moderate effectiveness of Neurontin at combating her neuropathy, and internal testimony inconsistencies; in concluding that Plaintiff was not entirely credible. Again, Plaintiff's brief provides no citation to contradictory evidence or any argument that the credibility determination was based on improper factors.

The Court is limited to determining whether the ALJ applied the appropriate standard to the credibility assessment. *Cruse*, 502 F.3d at 542. It is certainly true that Plaintiff would wish her subjective complaints to be taken at face value; however, that does not alter the reasonableness of the ALJ's citation to contrary evidence. From a review of the opinion and the record, the ALJ applied the correct standard and had substantial evidence to support the conclusion that Plaintiff was not entirely credible. *See Jones,* 336 F.3d at 477 (a court must affirm the ALJ decision if supported by substantial evidence, even if it's possible substantial evidence supports a different decision).

### *Step Five*

Plaintiff's final argument alleges that the hypothetical questions presented to the VE did not accurately describe her impairments and thus, the VE's testimony regarding available positions could not be substantial evidence. (Doc. 13, at 11-12). Particularly, Plaintiff alleged the

21

hypotheticals did not include a sit/stand option, restrictions for her marked mental limitations, or her carpal tunnel syndrome. (Doc. 13, at 12).

"It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey,* 987 F.2d at 1235. The opinion outlining a marked mental limitation (Dr. Shamberg's) was found to be entitled to little weight. The Court already affirmed the ALJ had substantial evidence to support this conclusion; thus, the ALJ did not err by not including Dr. Shamberg's marked mental limitations in the hypothetical.

The two other restrictions – a sit/stand option and a limitation for gross and fine manipulation to 50% of the day – were outlined in Dr. Johnson's opinion. (Tr. 440-42). As held above, the ALJ did not err in discounting the weight given to Dr. Johnson's opinion and thus, he did not have to include these restrictions. Instead, the ALJ gave significant weight to Dr. Feser's opinion whose restrictions were reflected in the RFC. The ALJ's hypotheticals accurately reflected Plaintiff's abilities; as such, the ALJ's reliance on the VE's testimony is substantial evidence. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)).

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed.


   s/James R. Knepp II
United States Magistrate Judge

22

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).